# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| All monies, funds, and financial instruments deposited in or credited to Account #⬛⬛⬛9336, at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja, "Checking Account" and deposited or credit to Account #⬛⬛⬛0319 at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja "Savings Account". | ) ) ) ) ) ) ) ) |

Case No. 4:16MJ5241 NAB

## APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT

I, Robert Polanco, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation and have reason to believe that there is now certain property namely

All monies, funds, and financial instruments deposited in or credited to Account #⬛⬛⬛9336, at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja, "Checking Account" and deposited or credit to Account #⬛⬛⬛0319 at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja "Savings Account",

**which is**

subject to forfeiture under Title 18, United States Code, Sections 981(a) and 982(a), and therefore is subject to seizure under Title 18, United States Code, Sections 981(b) and 982(b), and Title 21, United States Code, Sections 853(e)&(f) concerning a violation of Title 18, United States Code, Section 1956(a)(2)(A).

The funds identified herein are subject to civil forfeiture without regard to their traceability to criminal activity because they are contained in an account into which identical traceable property has been deposited and therefore may be forfeited as fungible property under Title 18, United States Code, Section 984.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

<u>SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE</u>

Continued on the attached sheet and made a part hereof.   __X__ Yes _____ No

_____
Signature of Affiant, Special Agent Robert Polanco

Sworn to before me, and subscribed in my presence

August 26, 2016                          at 16:18
Date and Time Issued

Honorable Nannette A. Baker, U.S. Magistrate Judge
Name and Title of Judicial Officer

at  St. Louis, Missouri
City and State

_____
Signature of Judicial Officer

# AFFIDAVIT

I, Robert Polanco, hereafter referred to as Affiant and being duly sworn, hereby depose and state:

## INTRODUCTION

1. Affiant has been a Special Agent with the Federal Bureau of Investigation (FBI) for the past eight (8) years. During that time, Affiant has been assigned to the St. Louis Division and has investigated matters involving counterintelligence, to include economic espionage and theft of trade secrets violations, and other matters in which there is a federal investigative or prosecutorial interest. Affiant is currently assigned to investigate matters involving counterintelligence. The information contained in this affidavit is based on Affiant's information received from other law enforcement agents assisting in this investigation and what Affiant has learned from other sources specifically discussed herein. Since this affidavit is being prepared for the limited purpose of supporting an application for a warrant to seize certain property subject to forfeiture, this affidavit does not purport to set forth all of Affiant's knowledge or investigation into this matter.

2. This affidavit is prepared in support of a warrant to seize funds in three bank accounts, described as Bank of America checking account #■■■■9336 and Bank of America savings account #■■■■0319, in the name of Jiunn Ren Chen & Irma Khoja, as reflected in Attachment A hereto, and US Bank account #■■■■2686, in the name of Investors Title Company, as reflected in Attachment B hereto (together, the "Funds"). The property to be seized is subject to forfeiture because it is property involved in money laundering in violation of Title 18, United States Code, Sections 1956(a)(2)(A), and thus subject to civil and criminal forfeiture under Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1). The Funds are subject

to civil forfeiture without regard to their traceability to criminal activity because they are contained in an account into which identical traceable property has previously been deposited and therefore may be forfeited as fungible property pursuant to Title 18, United States Code, Section 984.

3.    As set forth herein, there is probable cause to believe that Jiunn Ren Chen ("Chen") has violated Title 18, United States Code, Section 1832 by stealing and misappropriating without authorization trade secrets (the "Trade Secrets") from The Climate Corporation, a subsidiary of Monsanto Corporation, with its headquarters in St. Louis, Missouri, by downloading them from Monsanto's cloud computing services both before and after his employment had concluded. Chen, who has been aware of the government's investigation into his conduct, unexpectedly purchased plane tickets on Friday, August 19, 2016 for himself and his family to fly to China and departed via aircraft the very next day, despite his attorney's indicating the day before that Chen had no plans to leave the country. The following Monday, August 22, 2016, Chen authorized his attorney to act as his agent to close on the sale of his home in the United States, and sought thereafter to have the proceeds of the sale transmitted to Chen. Over the course of the next two days, the Chens have transferred or withdrawn more than $21,500.00 from their American bank accounts and transferred them to bank and credit accounts in China.

4.    I therefore respectfully submit, as described in greater detail below, that there is probable cause to believe that Chen has fled and absconded from the United States in order to impede and obstruct the criminal investigation into Chen's conduct, as well as to further possession, concealment, and carrying away of the Trade Secrets. His attempts to transfer the Funds abroad in order to promote his continued absence from the United States and unauthorized

possession and concealment of the Trade Secrets thus constitute attempted money laundering and make the Funds subject to civil and criminal forfeiture.

## LEGAL BACKGROUND

5. Title 18, United States Code, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956" and "any property traceable to such property" is subject to civil forfeiture.

6. Likewise, Title 18, United States Code, Section 982(a)(1) provides that "any property, real or personal involved in" an offense in violation of section 1956 and "any property traceable to such property" is subject to forfeiture.

7. Title 18, United States Code, Section 1956(a)(2)(A) makes it a crime to "transport, transmit, or transfer, or attempt to transport, transmit, or transfer … funds from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity." (Unlike Section 1956(a)(1)(A), which applies to transmission of funds within the United States, Section 1956(a)(2)(A) does not require that the funds so transmitted be proceeds of a specified unlawful activity.)

8. Title 18, United States Code, Section 1956(c)(7) defines "specified unlawful activity" to include "any act or activity constituting an offense listed in section 1961(1)"of Title 18.

9. Title 18, United States Code, Section 1961(1) lists, among other offenses, obstruction of justice in violation of section 1503, economic espionage in violation of Section 1832, and money laundering in violation of Section 1956.

10. Title 18, United States Code, Section 1503 makes it a crime to "corruptly . . . obstruct, or impede, or endeavor to . . . obstruct, or impede, the due administration of justice."

11.     Title 18, United States Code, Section 1832(a)(1) makes it a crime to knowingly steal, or without authorization appropriate, take, carry away, or conceal, or by fraud, artifice, or deception obtain a trade secret related to a product or service used or intended for use in interstate or foreign commerce, with the intent to convert the trade secret for the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of the trade secret.

12.     Title 18, United States Code, Section 1832(a)(2) makes it a crime to knowingly copy, duplicate, download, upload, replicate, transmit, deliver, send, communicate, or convey a trade secret related to a product or service used or intended for use in interstate or foreign commerce, with the intent to convert the trade secret for the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of the trade secret.

13.     Title 18, United States Code, Section 1832(a)(3) makes it a crime to possess a trade secret related to a product or service used or intended for use in interstate or foreign commerce, knowing the trade secret to have been stolen or appropriated, obtained, or converted without authorization, with the intent to convert the trade secret for the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of the trade secret.

14.     Title 18, United States Code, Section 1832(a)(4) makes it a crime to attempt to commit any of the offenses prohibited by Section 1832(a)(1), (a)(2), or (a)(3).

15.     Title 18, United States Code, Section 1832(a)(5) makes it a crime to conspire to to commit any of the offenses prohibited by Section 1832(a)(1), (a)(2), or (a)(3), so long as one or more conspirator does any act to effect the object of the conspiracy.

## DISCOVERY OF THE THEFT OF TRADE SECRETS

16.     Until June 1, 2016, Chen worked for Monsanto or its subsidiary, The Climate Corporation ("TCC"), since 2010. From 2010 to 2014, Chen worked for Monsanto, a company that delivers agricultural products that supports farmers all around the world. Specifically, Monsanto produces and develops agricultural and vegetable seeds, plant biotechnology traits and crop protection chemicals. While employed by Monsanto, Chen worked on many projects related to seeds and biotechnology traits. In 2014, Chen started working for TCC after it was acquired by Monsanto. Chen worked on data analytics and product concepts while with TCC. TCC combines hyper-local weather monitoring, agronomic modeling, and high-resolution weather simulations to help farmers improve profitability by making better informed operating and financing decisions. Monsanto acquired TCC to serve as the foundation for Monsanto's vision of an agricultural "Google."

17.     On June 1, 2016, Chen submitted his written two-week resignation to Monsanto. Chen stated that he wanted to move back to Taiwan to spend more time with his family. Chen verbally claimed to co-workers that he wanted to be closer to his ill father, who works in the real estate business in Taiwan.

18.     On June 2, 2016, Chen returned two work computers to Monsanto: a Macbook Pro, serial number C0ZMF4GJFD57, used by Chen when he worked for TCC; and a Lenovo ThinkPad T440, serial number PF0Z6XDR, used by Chen when he worked for Monsanto. TCC's Information Technology (hereinafter referred to as "IT") personnel assumed custody of these computer laptops, conducted a log check of software on the Macbook, and subsequently

5

discovered suspicious software. On June 2, 2016, TCC IT personnel gave the laptops to Monsanto's Information Security Office forensic team ("ISO"). ISO performed an overall analysis of these laptops in accordance with Monsanto's standard operating procedure when dealing with employee departures. This led to the discovery that the following software was contained on the Macbook: GNU Privacy Guard (GPG) encryption package, which allows the encryption and signing of data and communications and features a versatile key management system and access modules for all kinds of public key directories; a Secure Delete application, which overwrites data in a file to make the deleted data no longer accessible, even to forensic analysts; and three Virtual Private Networks (VPNs), which create encrypted connections over less secure networks. Monsanto ISO personnel advised that, together, these software packages would effectively mask any nefarious cyber activity conducted on the Macbook. Monsanto ISO personnel also discovered that the Lenovo Thinkpad T440 had a number of network scanning tools, which, when used in combination, allow an individual to covertly look within a network for vulnerabilities. These network scanning tools include Wireshark, which is a network protocol analyzer; Fiddler, which is used to troubleshoot and analyze networks; various torrents, which are used to distribute files over the internet; C Cleaner, which is used to scan computers for temporary files or private browser information and delete them it from computers; and various malware, which is malicious software designed to damage or disrupt a system. Chen's supervisor advised that Chen did not have a legitimate reason for having any of this listed software on the Macbook Pro and Lenovo Thinkpad T440 because it did not pertain to Chen's work responsibilities.

19.     Based on information I received from Monsanto forensic experts and FBI forensic experts, as well as my training and experience, I know that these software packets can be used to

locate, intrude on, obtain, procure, and copy files and data and then conceal the intrusion. Monsanto ISO personnel also advised the FBI that a mass data deletion was performed on both laptops on June 1, 2016, the day of Chen's resignation. This resulted in Chen having a very small digital footprint in terms of work product and personal files on either laptop.

20.     On or about June 7, 2016, Monsanto personnel scheduled an interview with Chen to discuss the presence of the aforementioned software packages on the two laptops. The interview between Chen and Monsanto personnel took place on June 9, 2016, at the Starbucks located at 6622 Chippewa Street, St. Louis, Missouri 63109. This location was selected by Chen. The interviewing team of Monsanto personnel asked Chen a number of questions related to the presence of the aforementioned software packages on the Macbook Pro and Lenovo ThinkPad T440 laptops. Chen denied having any knowledge of the software packages' capabilities.

21.     As the conversation progressed, Chen provided conflicting answers to questions. For instance, he told the Monsanto personnel he deleted everything on his laptops by placing everything in the trash bin and then "securely deleted it." Chen later amended this statement and said he simply emptied the trash bin. Monsanto personnel asked Chen to explain this process. Chen responded by saying, "I didn't download the program," but later said, "I used the secure delete." Chen stated that he used secure delete because he did not want anyone to view his personal files on the laptops, and he claimed that another employee had told him that Monsanto accesses employees' personal files after they return their laptops.

22.     Chen also claimed to have had "drop boxes" (a type of cloud-based storage system) for both laptops for data storage purposes. Chen further claimed to have hardly used the Lenovo ThinkPad T440 since 2013 for reasons other than to access Monsanto's library, establish calendars and use his work email for personal communications pertaining to his divorce and a

house purchase. These statements are inconsistent with Monsanto ISO personnel's discovery that two USB drives had been inserted into the Lenovo ThinkPad since April 2016. Chen also claimed he used the USB drives to copy and save photographs of his child. Despite this, Chen claimed that he had not accessed the Google Drive account associated with the Macbook since June 1, 2016. Additionally, Chen stated that he used his personal iPhone to work from home.

23.     On June 13, 2016, Monsanto ISO personnel discovered the unauthorized use of another TCC employee's account on Chen's TCC Macbook. The account belonged to "J.C.," a customer support employee, who does not work with IT support and is not part of Chen's working group. This use took place at approximately 7:25 a.m. on June 1, 2016, the day of Chen's resignation, but before Chen returned the Macbook Pro to Monsanto on that same day. On June 13, 2016, Monsanto ISO personnel interviewed J.C. who stated that he did not know Chen, did not log onto Chen's Macbook, and did not know why his (J.C.'s) account would have been accessed via Chen's.

24.     Shortly thereafter, Monsanto personnel discovered that approximately 63 files were downloaded from Chen's TCC Google Drive account between June 1, 2016 and June 10, 2016. These downloads took place after Chen returned the TCC Macbook Pro and Monsanto Lenovo ThinkPad T440 laptops. The 63 file downloads were from Chen's account on Google Drive. Two passwords are required to access Chen's TCC Google Drive, and Chen still possessed both of these passwords between June 1, 2016 and June 10, 2016. Monsanto's Business Conduct Office and TCC leadership stated that all 63 of these files contain confidential trade secrets and proprietary sensitive material (the "Trade Secrets"). According to Monsanto personnel, the files are of very high importance to Monsanto's overall economic viability as an organization and include pending projects. Monsanto also confirmed Chen did not have

authorization to download the 63 files from his Monsanto TCC Google Drive account following his resignation. Furthermore, Monsanto TCC personnel were informed Chen had transferred all of his work responsibilities to other co-workers weeks prior to his resignation. Accordingly, there was no legal or legitimate reason for Chen to access TCC's cloud storage or to download files from it.

25.     The following is a listing of all downloads from Chen's TCC Google Drive account, jchen@climate.com, spanning from June 1, 2016 to June 10, 2016. According to Chen, only he had access to his TCC Google Drive account, TCC Macbook Pro and Monsanto Lenovo ThinkPad T440 and no one else had the passcodes to these accounts. The downloaded files contain Trade Secrets. Because the titles of these downloaded files are highly sensitive in nature, the titles are not listed in this affidavit but they are known to law enforcement.

i.      On June 1, 2016, six downloads took place at approximately 7:36 p.m. CT.

ii.     On June 2, 2016, two downloads took place between 6:58 p.m. and 11:19 p.m. CT.

iii.    On June 4, 2016, one download took place at approximately 7:29 a.m. CT.

iv.     On June 5, 2016, one download took place at approximately 4:26 a.m. CT.

v.      On June 6, 2016, one download took place at approximately 8:37 p.m. CT.

vi.     On June 8, 2016, one download took place at approximately 3:32 p.m. CT.

vii.    On June 10, 2016, 51 downloads took place at approximately 3:47 a.m. CT.

Given the sheer volume of the final download of 51 files with a singular timestamp, Monsanto ISO personnel advised this could not have been downloaded via a cellular phone. Accordingly, the download would have had to occur on another computing device.

26.     Normal Monsanto business hours are between 7:00 a.m. to 5:00 p.m. Central Time.  All but three of the files were downloaded outside of normal work hours, and all after

9

Chen tendered his resignation. With the exception of the first download, all of the downloads occurred after Chen had returned his company devices to Monsanto. The June 10, 2016 downloads occurred very early in the morning—before work hours—the day after Monsanto's interview of Chen.

27.     On June 14, 2016, Monsanto employees interviewed Chen. An FBI Agent was present for the interview. Chen was asked about his iPhone, and he offered Monsanto the opportunity to examine the phone to look for any downloaded data. Chen admitted to deleting his Gmail account and certain applications prior to the interview because he thought that Monsanto would ask to examine his phone. Monsanto employees reviewed the phone and determined that his iPhone had been wiped clean. When asked about the 63 downloaded documents, Chen denied downloading the documents. Monsanto employees showed Chen the list of documents, and Chen advised them that he was familiar with the documents and proceeded to describe them based only on the names of the documents. Chen also acknowledged that the information in these documents was considered to include "trade secrets."

28.     During the interview, Chen admitted attending a job interview for a People's Republic of China state-sponsored agricultural company that is one of Monsanto's competitors. According to Chen, the job interview occurred four weeks prior in China, two weeks before Chen tendered his resignation. Chen stated he was offered a job with that company and was strongly considering the job offer. During the interview, Chen also stated that he did not have a computer in his residence but his wife did. He further stated that his wife also had a hard drive and a USB drive. He further stated that his wife was an attorney and may have had legal files and client information on her computer. Chen then showed Monsanto personnel a hard drive that

he had brought with him to the interview. Chen stated the hard drive belonged to his wife, with whom he resided. Chen would not allow Monsanto to look at the hard drive.

29.     Chen has acknowledged that: (1) he used thumb drives; (2) his wife had a computer in their residence; and (3) he had a strong familiarity with cloud-based computing. Monsanto officials have stated that Chen "worked and lived in the cloud."

30.     Chen traveled to China on or about May 4, 2016 and returned on or about May 15, 2016.

31.     Monsanto advised that the TCC Macbook was turned on and connected to a Chinese wi-fi via service ASI5003, Nobis-tech, Nobis Technology Group LLC, via IP address 104.238.32.44 on or about May 9, 2016 while Chen was in China.

32.     Monsanto personnel determined that Chen had previously transmitted trade secret information from his TCC email account to the email account of his wife, Khoja, and his personal email account, without authorization and in violation of company policy. He did so at on the following dates and at the following times:

      a.  Tuesday, August 19, 2014 at 4:11 p.m. to ikhoja@gmail.com

      b.  Wednesday, November 5, 2014 at 2:16 p.m. to diceros.chen@gmail.com

      c.  Wednesday, November 12, 2014 at 3:54 p.m. to ikhoja@gmail.com

      d.  Saturday, February 14, 2015 at 5:36 p.m. to diceros.chen@gmail.com

      e.  Saturday, February 14, 2015 at 5:36 p.m. to diceros.chen@gmail.com

Monsanto advised that its Chief Scientist reviewed the aforementioned emails and confirmed they contained very rich trade secret information.

33.     Monsanto, via its Husch Blackwell legal counsel (hereinafter referred to as "Husch"), advised that the jchen@climate.com was used to email a total of 37 attachments to

himself at the same email account, jchen@climate.com, between April 5, 2016 and April 6, 2016. Monsanto believes, but its Chief Scientist has not yet confirmed, that these attachments contained some of Monsanto's trade secret information. Monsanto, also via Husch, advised that 15 of the 37 attachments were accessed on the Lenovo Thinkpad T440 prior to the insertion of a Kingston thumb-drive on April 6, 2016.

34.     Speartip digital forensic analysts (hereinafter referred to as "Speartip"), who Monsanto contracted for its civil litigation efforts against Chen, advised seven of the 37 aforementioned attachments appeared to have been printed on April 6, 2016. Speartip also advised that the aforementioned Kingston thumb-drive was also inserted into the TCC Macbook Pro on or about May 12, 2016, while Chen was in China and/or Taiwan.

35.     The significance of the dates May 9, 2016 and May 12, 2016 is that, as further described below, Chen later claimed in an interview to have traveled to China without the TCC Macbook, and Khoja later claimed in an interview that Chen did travel to China with the Macbook. In addition to Khoja's contradiction of Chen's statement, Speartip advised that Meraki Systems Manager, which is a highly reliable software application that facilitates the ability to manage a Macbook's various systems and includes the ability to recover GPS location information, indicated the following:

   a.   The Macbook Pro was in Rolla, Missouri on April 8, 2016.

   b.   The Macbook Pro was in Wuhan, China (location of CNS) from May 4, 2016 to May 5, 2016.

   c.   The Macbook Pro was in Shenzhen, China on May 7, 2016.

   d.   The Macbook Pro was in Beijing, China (location of Sinochem) on May 8, 2016.

e. The Macbook Pro was in Taipei, Taiwan (location of Chen's father and two hours away from Wuhan, China) from May 11, 2016 to May 14, 2016.

f. The Macbook Pro was in St. Louis, Missouri on May 16, 2016.

## SEARCH OF CHEN'S RESIDENCE

36.    On June 16, 2016, the United States District Court Magistrate Judge Noelle Collins authorized a search warrant for Chen's residence. The search warrant authorized the search of Chen's residence for evidence, contraband, fruits of this crime, and instrumentalities of this crime. On June 16, 2016, Special Agents and Forensic Examiners assigned to the FBI's St. Louis Division (hereinafter referred as "St. Louis Division") executed the search warrant. During the search, the computer Forensic Examiners made forensic copies of a number of different electronic media in Chen's residence for future analysis. Additionally, Special Agents interviewed both Chen and Irma Khoja (hereinafter referred as "Khoja"), who is Chen's current wife.

37.    During the interview of Chen, Chen said he reached out to Jun Hua Peng, who worked for Sinochem China National Seeds Corporation (hereinafter referred as "Sinochem") prior to August 2015. Chen and Peng spoke over the telephone. During his conversation with Peng, Chen expressed interest in a job with Sinochem. Since the initial contact, Chen continued to have contact with Peng approximately every two to three weeks via We Chat (hereinafter referred as "WC"), which is a social media digital application that facilitates the exchange of information between numerous individuals. Chen claimed he and Peng exchanged online articles via WC. In March 2016, Peng offered Chen a job. Chen admitted that he traveled to China for approximately one week in early May 2016 for a job interview associated with Peng's offer.

38.     Chen reported that, while in China, he met with representatives of the Life Sciences Center (hereinafter "LSC"). These individuals were Peng, Qi Fa Zhang, and Fa Song Zhou. Zhang was the director and figurehead of the LSC, as a well as a member of the American National Academy of Sciences. Zhou, who previously worked for Monsanto approximately six years ago, was the director of molecular breeding at LSC.

39.     At some point during the trip, Peng pointed to a specific position on LSC's organizational chart and told Chen that the position of Director of Resource Management and Bio-informatics was Chen's, if Chen chose to accept the position. At the time of the offer, Peng served in two capacities at the LSC, as Vice Director for the LSC and as the Director of Resource Management and Bio-informatics. Chen advised he planned to move to China in approximately three to four months if he accepted Peng's offer, which would be for less monetary and compensation benefits than Chen earned while working for Monsanto. Additionally, Chen said he would work in Wuhan, China, which is approximately two hours away from his father's home in Taipei, Taiwan. Chen claimed no one asked him about his Monsanto-related work while in China.

40.     During the interview of Khoja, Khoja advised Chen contacted China National Seed (hereinafter referred as "CNS") for a job interview in December 2015. In May 2016, Chen and Khoja spent approximately 10 days in China and a couple of days in Taiwan visiting family. While in China, Chen met with a man whose last name was Peng for a job interview with CNS. Per Khoja, Chen took his Macbook and passport in a backpack to the job interview. (The Macbook had been provided to Chen by TCC.) Khoja said CNS offered Chen a job during this trip, but Chen didn't accept it right away, and both Khoja and Chen were still discussing it. Per Khoja, Chen would earn less money there than at Monsanto. Khoja advised Chen attempted to

install virtual private networks (hereinafter referred as "VPNs") onto the Macbook while in China because they wanted to use it for social media purposes. Chen attempted to download several VPNs, but the Astrill VPN didn't work, so they ended up using the Express VPN instead.

## PRELIMINARY RESULTS OF FORENSIC DIGITAL AND FINANCIAL ANALYSIS

41.    St. Louis Division's Computer Analysis Response Team (hereinafter "CART"), comprised of the Forensic examiners who originally imaged digital evidence seized during the search of Chen's residence, has been able to reach several preliminary conclusions from its analysis of the images. The preliminary examination has already revealed that the devices have been altered so as to remove any trace of potential evidence of their use to download the Trade Secrets between June 1 and June 10, 2016.

42.    On May 30, 2016, a Chrome cleaner software was run on the TCC Macbook Pro to remove all information from the Chrome Browser, to include all references to Google documents. Open source information indicates Chrome cleaners are used to clean browsers and remove cache and historical records.

43.    On May 30, 2016, the Chrome remote desktop application was removed from the TCC Macbook Pro. Open source information indicates this application allows someone to access other computers or to allow another user to access a computer securely over the internet.

44.    From May 29, 2016 to June 1, 2016, the Clean My Mac program was run each day on the TCC Macbook Pro. Open source information indicates this program allows a user to scan a Macbook's files, advises what can be removed and removes the selected files.

45.    On May 25, 2016, an iPhone cleaner program was removed from the TCC Macbook Pro. Open source information indicates this program allows a user to sweep an iPhone

for needless files and subsequently eliminate caches and other files for the purpose of freeing up memory and other storage space.

46.     On June 1, 2016, the Disk Drill program was run on the TCC Macbook Pro. Open source information indicates this program allows a user to scan and recover data from virtually any storage device, including a Macbook hard-drive and external hard-drive.

47.     On an unknown date, a Diskcartography program was run on the TCC Macbook Pro in an attempt to recover information. Open source information indicates this program is used to scan and analyze disks and folders for the purpose of cleaning and freeing up space.

48.     On an unknown date, an Easeus Mac data recovery program was run on the TCC Macbook Pro. Open source information indicates this program is used to recover deleted, formatted, inaccessible or lost data from Mac notebooks, desktops, digital devices or storage media.

49.     On May 25, 2016, May 27, 2016 and May 30, 2016, Eraserscanner was run on the TCC Macbook Pro.

50.     From May 25, 2016 thru May 30, 20106, System Cache Scanner, which CART advised is used to look for temporary files in a computer's cache for subsequent deletion, was also run on the TCC Macbook Pro.

51.     CART also advised that the aforementioned Kingston thumb-drive was inserted into four computers, three of which were the Macbook Pro, Thinkpad Lenovo T440 and a laptop that belonged to one of Chen's neighbors.

52.     Lastly, CART discovered that one of Monsanto's trade secret documents was uploaded into a Google Drive account and that another of Monsanto's trade secret documents was uploaded into an online data storage facility that facilitates the sharing and amending of

information. This facility was formerly known as Wireleaf, but is now known as Overleaf. Monsanto advised that neither the former upload, which was identified via web-link https://drive.google.com/file/d/0B1MzQ-eiEzg1OHoycWZKdnNjaFk/view?usp=sharing, nor the latter upload, which was identified via web-link https://www.writelatex.com/1575914xtxnbj#/3922229, was authorized. Lastly, Monsanto advised that neither it nor TCC owned the aforementioned Google Drive account. Because of this, Monsanto believes this account is a personal Google Drive account.

53.     As such, the search of Chen's home and the devices seized therefrom did not reveal any portable media onto which Chen had downloaded or otherwise saved the Trade Secrets, nor did it reveal paper copies of any of the Trade Secrets. As such, the investigation so far has been unable to conclusively identify the location of any copies of the Trade Secrets made by Chen. It is therefore suspected that Chen has been successful in concealing the location of any copies of the Trade Secrets made after the downloads occurred.

## INFORMATION RELATING TO ZHANG, ZHOU, AND SINOCHEM

54.     St. Louis Division personnel learned the People's Republic of China officially launched the State Key Laboratory of Crop Breeding Technology Innovation (hereinafter referred to as "Key Laboratory") on April 14, 2016. The laboratory aims to develop, integrate and apply crop breeding technology on worldwide agricultural plants by organically combining the latest research results in genomics and molecular biology with conventional breeding techniques in order to continuously launch new green crops with independent intellectual property rights. Zhou was named the laboratory's director. Zhang was named the director of the laboratory's academic committee.

55. Sinochem is a key state-owned enterprise based in Beijing, China. Core businesses owned by Sinochem span energy production, agriculture, chemical production, real estate and financial services. Sinochem owns CNS, which established the Wuhan Center for Life Science and Biotechnology—the biggest domestic proprietary research and development base in the industry in China. Sinochem was also chosen to run the Key Laboratory under the Ministry of Agriculture for Genetic Breeding of Crops like corn and rice.

56. Based on the above, your affiant concludes that CNS, the LSC, the Key Laboratory and the Key Laboratory under the Ministry of Agriculture for Genetic Breeding of Crops like corn and rice are directly owned and/or operated by Sinochem, an entity of the People's Republic of China.

### Chen's Unexpected Departure for China and Sale of His Home

57. Prior to Friday, August 20, 2016, attorneys from Husch have been engaged in continuous discussions with Richard Sindel, counsel for Chen, regarding Chen's mishandling of the Trade Secrets. Those discussions have included attempts by attorneys from Husch to obtain Chen's voluntary cooperation in gaining access to certain devices formerly in Chen's possession. On Friday, August 19, 2016, Husch requested that Mr. Sindel disclose the password for one such portable storage device to assist in recovering data from that device. Mr. Sindel reported that Chen claimed not to recall the password. Mr. Sindel was then asked to provide the answers to certain security questions which could be used to reset the password. The answers provided by Chen, through Mr. Sindel, were not successful in unlocking the device, and, as of the date of this writing, attorneys from Husch have been unsuccessful in gaining access to the encrypted data on the device.

58. Also on August 19, 2016, Husch questioned Mr. Sindel about Chen. Chen's attorney advised that Chen had not accepted any job nor had any future travel plans.

59. At an unknown time on August 19, 2016, Chen and Khoja each signed a separate Durable Power of Attorney, which appointed Richard H. Sindel as their Attorney In Fact to manage financial, real estate, and other affairs.

60. That evening, on August 19, 2016, Chen bought three one-way airline tickets to Shanghai, China for himself, his wife, and his daughter, with a departure date for the very next evening. Chen did not purchase return travel tickets.

61. At 11:30 a.m. on Saturday, August 20, 2016, Chen and his family departed St. Louis Lambert International Airport for Shanghai, China by way of Detroit Metropolitan Airport. After arriving in Shanghai, Chen and his family departed for Wuhan, China on August 21, 2016 at 9:05 p.m. local time.

62. Chen informed Customs and Border Patrol personnel (hereinafter referred to as "CBP") that he ultimately planned to travel to Taipei, Taiwan. However, Chen's travel itinerary does not reflect this. CBP informed Chen that he needed to return to the United States within six months because failure to do so would violate the terms of his legal permanent resident alien status. Chen, in response to CBP's advisory, stated he would return from Taipei in approximately two months.

63. On Monday, August 22, 2016, Chen sold his family's home, located at 6345 Bancroft, St. Louis, MO 63109 to an individual with the initials C.C. (the "Buyer"). Chen and Khoja were scheduled to appear at Investors Title Company to close on the sale. Instead, to the surprise of Investors Title Company, Mr. Sindel appeared as their attorney in fact and signed documents on their behalf to close on the sale of their residence.

64.     In exchange, Chen and his wife received the purchase price of $193,400, which funds were tendered by the Buyer to Investors Title Company, who issued a US Bank check #387143 to Jiunn-Ren Chen and Irma Khoja in the total amount of $111,516.68.

65.     On August 23, 2016, Chen and Khoja signed a letter directing Investors Title Company to make out the check for $111,516.68 from the sale of their residence to Mr. Sindel, "so that Mr. Sindel may deposit it into his client trust account for future disbursement to Mr. Chen and Ms. Khoja." Investors Title Company refused to issue a new check payable to Mr. Sindel.

66.     On August 25, 2016, Chen sent an email to Investors Title Company informing them "We've decided to have the check deposited into one of our accounts instead of changing the payee for the check. We don't want to further delay receiving the money by going through this process."

67.     On August 25, 2016, a Federal Grand Jury Subpoena was served on Sindel, who confirmed that he was in possession of check #387143 in the amount of $111,516.68 payable to Chen and Khoja and it had not been deposited. The subpoena requires Sindel to turn over the check to the U.S. Government by August 31, 2016. In a conversation with AUSAs Richard E. Finneran and Colleen Lang that same day, Mr. Sindel confirmed that in the meantime he would hold the check and would not deposit it.

### FINANCIAL ANALYSIS

68.     Investigators have reviewed transaction histories for Chen and Kohja's bank accounts in an attempt to determine whether Chen and Khoja intend to transmit funds from the United States to China in order to promote Chen's flight and continued possession, carrying

away, and concealment of the Trade Secrets. This section reveals the information deemed pertinent to that question by investigators.

69. On May 16, 2016, Chen deposited $9,400.00 in cash into his Bank of America checking account #▮▮▮▮▮9336 (the "Checking Account"). This deposit was made one day after Chen returned from his "job interview" in China with Sinochem. The sum of $9,400.00 is approximately $600.01 less than the amount that would have required Chen to file a Currency and Monetary Instruments Report (CMIR) had he entered into the country with that sum of money. It is also $600.01 less than the amount of money that would have required Bank of America to file a Currency Transaction Report (CTR) had Chen deposited such a sum into his bank account. A large cash deposit is also out of character for Chen when compared with his prior banking history. No other similarly large deposits of cash have been observed during the period January 29, 2016 to August 24, 2016.

70. Activity in the Checking Account indicates that the Chens have recently been using funds in that account to transfer funds for his use in China. In four separate transactions on August 24, 2016, the Chens withdrew a total of approximately $1,505.04 from the Checking Account while in Wuhan, China, an amount equal to approximately 10,000 Chinese yuan at current exchange rates.

71. Activity in the Chens' Bank of America savings account #▮▮▮▮▮0319 (the "Savings Account") likewise suggests that the Chens have been conducting transactions from that account since his departure from the United States in an attempt to transfer funds for his use in China. On August 23, 2016, Chen conducted a wire out of the Savings Account in the amount of $10,000.00, an amount equal to approximately 66,600 Chinese Yuan. The wire transfer record reflects "FX:CNY," which indicates that the transfer is a conversion of American dollars to

Chinese yuan. The memo line on the wire transfer request indicates "Family Support." The transfer was made to an account at the Industrial and Commercial Bank of China. Based upon this limited information, it appears that Chen has transferred $10,000.00 from the Savings Account into an account he controls at the Industrial and Commercial Bank of China.

72.     Also on August 23, 2016, Chen or Khoja initiated an online transfer for an additional $10,000.00 from the Savings Account to a credit account with the Hongkong and Shanghai Banking Corporation, which appears to be connected to a credit card. It thus appears that Chen and Khoja are attempting to obtain additional access to credit while they are in China by paying down or overpaying a credit card.

73.     As of August 24, 2016, the balance in the Checking Account was approximately $4,933.39. As of that same date, the balance in the Savings Account was approximately $20,739.86.

CONCLUSION

74.     The Funds sought hereby to be seized for forfeiture have been involved in an attempt to promote Chen's continuing carrying away, concealment, and possession without authorization of the Trade Secrets, as well as an attempt to promote Chen's efforts to obstruct and impede the due administration of justice by absconding from the United States to China. The Funds are therefore subject to civil and criminal forfeiture under Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) as property involved in attempted money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A).

75.     The Funds are subject to civil forfeiture without regard to their traceability to criminal activity because they are contained in an account into which identical traceable property

has previously been deposited and therefore may be forfeited as fungible property pursuant to Title 18, United States Code, Section 984.

76.     The Chens have already successfully transferred in excess of $21,500.00 to bank and credit accounts in China in order to aid flight and continuing carrying away, concealment, and possession of the Trade Secrets. The Chens' correspondence with Investors Title Company further demonstrates that the Chens likewise intended to have those funds transferred to them, even declining to await the issuance of a new check in order to accelerate their receipt of the funds. As these circumstances powerfully illustrate, funds like the Funds in this case can be moved easily and quickly. Thus, a seizure warrant is necessary to prevent further disbursement and dissipation of the Funds, and an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the Funds for forfeiture.

77.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and seizure warrant. I believe that sealing this document is necessary because the items to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## ATTACHMENT A

## LIST OF PROPERTY TO BE SEIZED FROM BANK OF AMERICA

All money, funds, and financial instruments deposited in or credited to Account Number ██████9336 at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja "Checking Account."

All money, funds, and financial instruments deposited in or credited to Account Number ██████0319 at Bank of America, in the name of Jiunn Ren Chen and Irma Khoja "Savings Account."

## ATTACHMENT B

## LIST OF PROPERTY TO BE SEIZED FROM US BANK

All money, funds, and financial instruments up to $111,516.68 deposited in or credited to Account Number ████686 at US Bank, in the name of Investors Title Company – Escrow Account, supporting check 387143, dated August 22, 2016, payable to Jiunn-Ren Chen and Irma Khoja.